SUN–SENTINEL COMPANY, a publisher of the South Florida Sun–Sentinel, Plaintiff,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, and its component Federal Emergency Management Agency, Defendants.

No. 05–60340–CIV.

United States District Court, S.D. Florida.

April 14, 2006.

December 2004, more than a year and a half later.

David Steven Bralow, Tribune, Orlando, FL, Rachel Elise Fugate, Deanna Kendall Shullman, Thomas & LoCicero PL, Tampa, FL, for Sun–Sentinel Company, publisher of the South Florida Sun–Sentinel, Plaintiff.

Steven R. Petri, United States Attorney's Office, Fort Lauderdale, FL, for U.S. Department of Homeland Security, Federal Emergency Management Agency, Defendants.

## OPINION AND ORDER

MARRA, District Judge.

This cause is before the Court upon the parties' cross motions for summary judgment [DE 31 and DE 39]. The Court heard oral argument on December 7, 2005. The Court has carefully considered the motions and the arguments of counsel and is otherwise fully advised in the premises.

### I. Background

The facts, as culled from affidavits, depositions, declarations, exhibits and reasonably inferred therefrom, for the purposes of these Summary Judgment Motions, are as follows:

The Federal Emergency Management Agency ("FEMA") is an agency of the United States Government that is responsible for, among other things, administering and coordinating the federal governmental response to Presidentially-declared disasters pursuant to the Robert T. Stafford Disaster Relief and Emergency Assistance Act ("Stafford Act"). See 42 U.S.C. § § 5121—et seq.; see also Executive Order No. 12148 of July 20, 1979 and 44 Fed.Reg. 43239. In particular, FEMA provides "federal assistance programs for public and private losses and needs sustained in disasters." 44 C.F.R. § 206.3(a) (2001).

In 2004, Florida was struck by four hurricanes in a single season. See Press Release, Federal Emergency Management Agency, Florida's Disaster Recovery Operation—By the Numbers (June 15, 2005), attached to Sally Kestin Declaration ("Kestin Decl.") at Tab 1, p. FOIA00006. During the course of recovery from these hurricanes, FEMA opened over 150 Disaster Recovery Centers throughout Florida to provide Stafford Act assistance to approximately 600,000 disaster assistance applicants with damages and losses from these hurricanes. See FEMA news release no. 1539–443 at Exhibit A, attached to Defendant's Motion for Summary Judgment. As of August 12, 2005, FEMA had disbursed more than $5.6 billion under FEMA's Individual and Public Assistance Program. See Press Release, Federal Emergency Management Agency, Florida 2004 Hurricane Recovery Passes $5.6 Billion Mark (August 12, 2005), attached to Kestin Decl. at Tab 1, pp. FOIA00542–FOIA00543. Of that amount, nearly $1.2 billion has been disbursed in individual assistance in response to applications from more than 1.2 million applicants. See Press Release, Federal Emergency Management Agency, FEMA and Florida Committed to Long–Term Recovery (June 24, 2005), attached to Kestin Decl. at Tab 1, p. FOIA0001; Press Release, Federal Emergency Management Agency, Florida's Disaster Recovery Operation—By the Numbers (June 15, 2005), attached to Kestin Decl. at Tab 1, p. FOIA00006.

FEMA disbursed more than $31 million in individual assistance to Miami–Dade County, where the National Weather Service reported that the strongest sustained winds during Hurricane Frances were tropical storm strength, where the highest recorded accumulation of rainfall was 3.77 inches, and where there was no reported flooding. *See* Press Release, Federal Emergency Management Agency, FEMA and Florida Committed to Long–Term Recovery (June 24, 2005), attached to Kestin Decl. at Tab 1, p. FOIA00004; Office of Audits, Audit of FEMA's Individuals and Households Program in Miami–Dade County, Florida, for Hurricane Francis, OIG–05–20 (May 2005), attached to Kestin Decl. at Tab 2, p. FOIA00081. Over a dozen individuals were indicted by the United States Attorney's Office for making false claims of assistance in connection with Hurricane Frances. *See* Press Release, U.S. Department of Justice, Fourteen Defendants in Miami–Dade County Indicted on Charges of Defrauding FEMA after Hurricane Frances (March 2, 2005), attached to Kestin Decl. at Tab 5.

The Department of Homeland Security Office of Inspector General conducted an Audit of FEMA's Individual Assistance Program in Miami–Dade County for Hurricane Frances. *See* Office of Audits, Audit of FEMA's Individuals and Households Program in Miami–Dade County, Florida, for Hurricane Frances, OIG–05–20 (May 2005), attached to Kestin Decl. at Tab 2, pp. FOIA00070–FOIA00132. The Inspector General's Audit found that: (1) FEMA designated Miami–Dade County eligible for individual assistance without a proper preliminary damage assessment; (2) claims were not properly verified; (3) guidelines for making awards were generally lacking; (4) oversight of inspections was deficient and (5) funds disbursed in Miami–Dade County were not based on actual losses. *Id.* at pp. FOIA00075, FOIA00079, FOIA00083. Additionally, the

Inspector General's Audit found that FEMA's inspectors were poorly trained and lacked oversight. Kestin Decl. at ¶ 14, Tab 2, p. FOIA00101–02. That investigation, however, only examined three percent of the nearly $31 million awarded to Miami–Dade County residents. *See* Office of Audits, Audit of FEMA's Individuals and Households Program in Miami–Dade County, Florida, for Hurricane Frances, OIG–05–20 (May 2005), attached to Kestin Decl. at Tab 2, pp. FOIA00078.

Additionally, in January 2005, the United States Senate Committee on Governmental Affairs launched an investigation into "allegations of fraud and waste in the distribution of disaster aid by [FEMA]." *See* Press Release, Senator Joe Lieberman, Senators Collins & Lieberman Initiated Investigation Into Possible Fraud Involving FEMA Dollars (January 6, 2005), attached to Kestin Decl. at Tab 4, p.FOIA00211. The Committee expressed "deep concern" about the awarding of FEMA aid. *See* Press Release, Senator Joe Lieberman, Senator Collins and Lieberman Release Findings and Recommendations to Improve Safeguards in FEMA's Disaster Relief Program (July 10, 2005), attached to Kestin Decl. at Tab 4, p.FOIA00203. The Committee also discovered that, in some instances, FEMA inspectors filled out forms without ever showing up at the houses to inspect the purportedly damaged property. *See* DE 34, Transcript from Tape, Hearing File DHS–IG–Report 051805, Exhibit A, p.FOIA00438. Furthermore, as many as twenty-two percent of FEMA inspectors processing individual assistance claims in Florida had criminal records. *See id.* at FOIA00374. In sum, the Committee recommended improvements in nineteen areas that would be "necessary to ensure fairness, accountability, and transparency" in the administration of FEMA's Individual Assistance Program. *See* Press Release, Senator Joe Lieberman, Senator

Collins and Lieberman Release Findings and Recommendations to Improve Safeguards in FEMA's Disaster Relief Program (July 10, 2005), attached to Kestin Decl. at Tab 4, p.FOIA00204–FOIA00206.

By letter dated September 28, 2004, the Sun–Sentinel, pursuant to the Federal Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, requested a copy in electronic format of FEMA's National Emergency Management Information System ("NEMIS"), a database used to track FEMA assistance requests and awards associated with Hurricanes Charley, Frances, Ivan and Jeanne. See Exhibit 1 attached to the Amended Complaint. In response, FEMA provided the Sun–Sentinel with 9,000 pages of eligibility and inspection spreadsheets, which provided a breakdown by zip codes of individual assistance applications and payouts for Hurricane Frances for Miami–Dade County from September 4, 2004 through October 18, 2004.[1] See Exhibit 3 attached to Amended Complaint. FEMA withheld the names and addresses of individual aid claimants and the addresses of damaged properties. FEMA asserted FOIA Exemption 6, 5 U.S.C. § 552(b)(6) and the Privacy Act regulations, 6 C.F.R. § 5.21(f) as the bases for withholding that information. See DE 23, Defendant's Notice of Filing of *Vaughn* Indexes at ¶ 4; Exhibit A to Defendant's Notice of Filing of *Vaughn* Indexes at ¶¶ 2–6.

By letter dated October 18, 2004, the Sun–Sentinel requested, among other things, the names of inspectors who conducted inspections in Miami–Dade County, certain e-mails to or from Michael Brown, the former Under Secretary of FEMA, and audits, inspector general reviews and quality control reviews of the FEMA Individual Assistance Programs. See Exhibit 10 attached to the Amended Complaint. On January 6, 2005, FEMA provided the Sun–Sentinel with the names of the companies providing inspectors for Miami–Dade County. See Exhibit 11 attached to Amended Complaint. FEMA informed the Sun–Sentinel that it did not maintain records of the names of individual inspectors. See *id.* Moreover, FEMA withheld the inspectors' identification numbers under FOIA Exemptions 4 and 6. See *id.* Additionally, FEMA asserted that five e-mails were redacted and twenty pages of e-mails were withheld pursuant to FOIA Exemption 5.[2] See *id.*

By letter dated January 19, 2005, the Sun–Sentinel made a request, pursuant to FOIA, for the same information from the NEMIS database but expanded the new request to include several additional disasters. See Exhibit 5 attached to the Amended Complaint. In response to this request, FEMA provided the Sun–Sentinel with 620,930 kilobytes of individual assistance data queried for the NEMIS system for the twenty-seven requested disasters.[3]

---

**1.** The requested information included: (1) the number of applications for individual assistance; (2) the number of approved applications; (3) the type of damage reported; (4) the amount of assistance required; (5) the type of assistance and (6) a breakdown of the amount of assistance approved. See Exhibit 3 attached to Amended Complaint.

**2.** By letter dated November 26, 2004, the Sun–Sentinel requested documents showing certain financial information for companies that contracted with FEMA, copies of quality control inspection reports from FEMA and a list of other companies that have held housing

inspection contracts with FEMA since 1990. See Exhibit 6 attached to Amended Complaint. On December 6, 2005, FEMA released records pertaining to the financial information of companies that contracted with FEMA. See DE 57, Defendants' Notice of Release of Records. FEMA also provided the Sun–Sentinel with a list of the contractors holding contracts with FEMA since 1990. See Exhibit 8 attached to the Amended Complaint.

**3.** If printed, this information would comprise almost 190,000 pages of information. See

That response included inspection information on each particular individual claimant which included: category of assistance, assistance status and type, eligibility date, eligible amount, ownership status, water level, cause of damage, insurance status for each item, description of each item, including personal property description, clothing, real property damage type, damage level as well as other information. *See* Exhibit L, Letter dated April 8, 2005 from FEMA to the Sun–Sentinel, attached to Defendant's Motion for Summary Judgment.

Additionally, FEMA asserted FOIA Exemption 6 as its basis for withholding the names and addresses of individual aid claimants. *See* DE 23, Defendant's Notice of Filing of *Vaughn* Indexes at ¶ 21; Exhibit A to Defendant's Notice of Filing of *Vaughn* Indexes at ¶¶ 11–17. Finally, FEMA asserted FOIA Exemptions 4 and 6, 5 U.S.C. § 552(b)(4)-(b)(6), as the bases for withholding the inspector's names and identification numbers responsive to this request.[4] *See* DE 23, Defendant's Notice of Filing of *Vaughn* Indexes at ¶ 22, Exhibit A to Defendant's Notice of Filing of Vaughn Indexes at ¶¶ 11–17. Lastly, FEMA withheld inspector comments claiming that a search for this material would interfere with the operation of the entire disaster processing system. *See* DE 23, Defendant's Notice of Filing of *Vaughn* Indexes, Exhibit A to Defendant's Notice of Filing of *Vaughn* Indexes at ¶ 17.

On March 8, 2005, the Sun–Sentinel filed the Complaint in this action. *See* DE 1.

On April 5, 2005, the Sun–Sentinel amended its complaint to include additional FOIA requests. *See* DE 7. As ordered by the Court on July 27, 2005, FEMA produced its *Vaughn* Index and affidavits. *See* DE 23. On October 19, 2005, FEMA filed several documents for *in camera* inspection. *See* DE 51.

In moving for summary judgment, the Sun–Sentinel seeks the following: (1) the names of the disaster applicants and the addresses of where the claimed property damage occurred; (2) the names and identification numbers of the inspectors who conducted inspections for individual assistance applications; (3) quality control inspection reports prepared by FEMA contractors; and (4) certain e-mail communications to or from Brown.[5] FEMA's Motion for Summary Judgment contends that FEMA is prohibited from releasing names and addresses of disaster claimants pursuant to the Privacy Act, that the Sun–Sentinel is not entitled under FOIA to the names and addresses of disaster claimants or the names and identification numbers of the inspectors, and that the Sun–Sentinel is not entitled to the information withheld from the e-mails. Additionally, FEMA argues that providing the inspector comments fields would result in the disruption of NEMIS. Finally, FEMA states that it is willing to turn over the information requested from the quality control results, however, it will not do so until the Court rules on whether the names and addresses of disaster claimants and the inspector's names and

---

Defendant's Motion for Summary Judgment at 15, ¶ 60.

4. FEMA withdrew its assertion that Exemption 5 provided a basis for withholding this information. *See* Defendant's Response to Plaintiff's Motion for Summary Judgment at 12 n. 5.

5. Sun–Sentinel's Motion for Summary Judgment also sought information pertaining to contractors key personnel as well as certain financial information pertaining to FEMA's contracts with PaRR and Alltech, Inc. That information has been provided to the Sun–Sentinel. *See* DE 57, Defendant's Notice of Release of Records.

identification numbers need to be provided.

## II. Legal Standard
### A. Summary Judgment Standard

The Court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The stringent burden of establishing the absence of a genuine issue of material fact lies with the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court should not grant summary judgment unless it is clear that a trial is unnecessary, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and any doubts in this regard should be resolved against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548. To discharge this burden, the movant must point out to the Court that there is an absence of evidence to support the nonmoving party's case. *Id.* at 325, 106 S.Ct. 2548.

After the movant has met its burden under Rule 56(c), the burden of production shifts and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). According to the plain language of Fed.R.Civ.P. 56(e), the non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleadings," but instead must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348.

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim. *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir.1990). If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, then summary judgment may be granted." *Anderson*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202.

### B. Legal Framework in FOIA Actions

 "The basic purpose of the FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *National Labor Relations Bd. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242, 98 S.Ct. 2311, 57 L.Ed.2d 159 (1978). The objective of FOIA is "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Department of Air Force v. Rose*, 425 U.S. 352, 361, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976) *quoting Rose v. Department of Air Force*, 495 F.2d 261, 263 (2d Cir.1974). In order to prevent the disclosure of a document, the government agency must demonstrate that the document falls under one of FOIA's nine statutory exemptions. *Moye, O'Brien, O'Rourke, Hogan & Pickert v. National Railroad Passenger Corp.*, 376 F.3d 1270, 1276–77

(11th Cir.2004). These exemptions, however, must be "narrowly construed." *Id.* at 1277. Since FOIA has a "strong presumption in favor of disclosure," the agency bears the burden to prove that a requested document is exempted under FOIA. *United States Department of State v. Ray,* 502 U.S. 164, 173, 112 S.Ct. 541, 116 L.Ed.2d 526 (1991).

The following exemptions have been invoked by FEMA in the instant case:

a. Exemption 4 which allows a government agency to withhold the disclosure of "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). FEMA invoked this exemption with respect to the disclosure of the inspector names and identification numbers.

b. Exemption 5 which allows a government agency to withhold the "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). FEMA invoked this exemption with respect to the disclosure of the e-mails.

c. Exemption 6 which allows a government agency to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). FEMA invoked this exemption with respect to the disclosure of the inspectors' names and identification numbers as well as the disaster claimants' names and addresses.

When Exemption 6 is claimed, the proper analysis begins with an examination of the Privacy Act. That act prohibits the disclosure of "any record which is contained in a system of records by any means of communication to any person ...except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of the record would be ... required under [FOIA]." 5 U.S.C. § 552a(b)(2). The Privacy Act serves to "impose[ ] a standard of quality and diligence on the maintenance of government records." *Cochran v. U.S.,* 770 F.2d 949, 954 (11th Cir.1985) *quoting Doe v. United States Civil Serv. Comm'n,* 483 F.Supp. 539, 555 (S.D.N.Y.1980). However, "[s]ubsection (b)(2) of the Privacy Act expressly defers to the mandatory disclosure requirements of the FOIA by prohibiting the nonconsensual release of personal information unless the information is required to be disclosed under the FOIA." *See Cochran,* 770 F.2d at 954–55.

## III. Discussion

### A. Release of Names and Addresses of Individual Disaster Claimants

FEMA argues that it is prohibited from releasing the names and addresses of individual disaster claimants pursuant to the Privacy Act, 5 U.S.C. § 552a, without a court order. *See* Defendant's Motion for Summary Judgment at 18. Moreover, FEMA argues that the names and addresses of individual disaster claimants fall under Exemption 6 of FOIA because there is a substantial privacy interest at stake, the privacy interest outweighs the public interest and the release of this information would not serve the public interest. *Id.* at 21, 25. In contrast, the Sun–Sentinel argues that there is no significant privacy interest at stake and that the requested disclosure would contribute significantly to the public understanding of the operations of FEMA. *See* Plaintiff's Memorandum in Support of Summary Judgment at 7, 9.

Based on the relationship between the Privacy Act and Exemption 6 of FOIA noted earlier, the Court must examine whether Exemption 6 applies to the requested release of the names and addresses of disaster claimants. FEMA bears the burden of demonstrating that this information falls within one of FOIA's statutory exemptions.

■ Here, FEMA asserts that Exemption 6 prohibits the release of the names and addresses of disaster claimants. In making this argument, FEMA correctly points out that this information falls within the meaning of "similar files" under Exemption 6.[6] *See United States Department of Defense v. Federal Labor Relations Auth.*, 510 U.S. 487, 494–95, 114 S.Ct. 1006, 127 L.Ed.2d 325 (1994) (individual addresses may fall within Exemption 6 of FOIA); *Ray*, 502 U.S. at 173, 112 S.Ct. 541 (names and addresses may fall within Exemption 6). Although names and addresses meet the threshold requirement for protection under Exemption 6, the Court must apply a balancing test to determine whether disclosure of the names and addresses would constitute a "clearly unwarranted" invasion of personal privacy within the meaning of Exemption 6. *See Federal Labor Relations Auth.*, 510 U.S. at 495, 114 S.Ct. 1006.

■ In conducting this test, the Court must balance "the public interest in disclosure against the [privacy] interest Congress intended the [e]xemption to protect." *Id. quoting Department of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 776, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989). In so doing, the Court must weigh the "relevant public interest in disclosure" and the "extent to which disclosure would serve the core purpose of the

FOIA, which is contributing significantly to public understanding of the operations or activities of the government." *Id. quoting Reporters Comm.*, 489 U.S. at 775, 109 S.Ct. 1468 (internal quotation marks omitted); *see also Rose*, 425 U.S. at 372, 96 S.Ct. 1592. In other words, in analyzing the public interest, the Court must examine whether the disclosure would "let citizens know what their government is up to." *Federal Labor Relations Auth.*, 510 U.S. at 497, 114 S.Ct. 1006 *quoting Reporters Comm.*, 489 U.S. at 773, 109 S.Ct. 1468 (internal quotation marks omitted).

■ Applying these principles to the case at hand, the Court begins by examining the privacy interest in a home address. The Eleventh Circuit has stated, in examining this very question, that "individuals have an important privacy interest in their home address." *See O'Kane v. United States Customs Svc.*, 169 F.3d 1308, 1309–10 (11th Cir.1999); *Federal Labor Relations Auth. v. United States Dep't of Defense*, 977 F.2d 545, 549 (11th Cir.1992) ("the privacy interest in a home address is important."); *see also Federal Labor Relations Auth.*, 510 U.S. at 501, 114 S.Ct. 1006 (characterizing the privacy interest in a home address as "nontrivial"); *Heights Cmty. Congress v. Veterans Admin.*, 732 F.2d 526, 529 (6th Cir.1984) (the privacy interest in a home address is "important"). Furthermore, the privacy interest in a home address is more substantial when personal information can be linked to a particular address. *Ray*, 502 U.S. at 176, 112 S.Ct. 541. Clearly, here, the release of the home addresses of disaster claimants raises a substantial privacy interest. Indeed, by revealing the home addresses of disaster claimants, it would be possible to link the addresses to the already released

---

**6.** The Sun–Sentinel does not dispute that names and addresses fall within the meaning

of "similar files" under Exemption 6.

personal information including the type of assistance received, eligibility date and amount of such assistance, whether the claimant owns the damaged property, the type and cause of damage sustained, descriptions of each item damaged and whether it was insured. *See* Exhibit L, Letter dated April 8, 2005 from FEMA to the Sun–Sentinel, attached to Defendant's Motion for Summary Judgment; *see also Rural Hous. Alliance v. United States Dep't of Agric.*, 498 F.2d 73, 76 n. 4 (D.C.Cir.1974) (Exemption 6 applicable to records including information regarding occupations, work history, amounts and sources of income, ownership of property, credit history)

Finding a substantial privacy interest in a home address, however, does not end the Court's inquiry. The Court must also examine whether the invasion of privacy that would ensue from releasing the addresses of disaster claimants would be "clearly unwarranted." In undertaking such an examination, the Court must analyze how the disclosure of these addresses would serve to inform citizens as to "what their government is up to." *Federal Labor Relations Auth.*, 510 U.S. at 497, 114 S.Ct. 1006 *quoting Reporters Comm.*, 489 U.S. at 773, 109 S.Ct. 1468.

A review of this record shows that there is a substantial and legitimate public interest in FEMA's handling of disaster assistance in the wake of recent hurricanes. As a result of the 2004 hurricane season, FEMA disbursed billions of dollars to approximately 1.2 million applicants. *See* Press Release, Federal Emergency Management Agency, Florida 2004 Hurricane Recovery Passes $5.6 Billion Mark (August 12, 2005), attached to Kestin Decl. at Tab 1, pp. FOIA00542–FOIA00543; Press Release, Federal Emergency Management Agency, FEMA and Florida Committed to Long–Term Recovery (June 24, 2005), attached to Kestin Decl. at Tab 1, p. FOIA0001; Press Release, Federal Emergency Management Agency, Florida's Disaster Recovery Operation—By the Numbers (June 15, 2005), attached to Kestin Decl. at Tab 1, p. FOIA00006.

Furthermore, several investigations unearthed that FEMA's disbursement of assistance was rife with fraud and waste. *See* Office of Audits, Audit of FEMA's Individuals and Households Program in Miami–Dade County, Florida, for Hurricane Frances, OIG–05–20 (May 2005), attached to Kestin Decl. at Tab 2, pp. FOIA00070–FOIA00132; *see* Press Release, Senator Joe Lieberman, Senators Collins & Lieberman Initiated Investigation Into Possible Fraud Involving FEMA Dollars (January 6, 2005), attached to Kestin Decl. at Tab 4, p.FOIA00211. Moreover, some members of Congress have concluded that the method used by FEMA to distribute funds suffered from various deficiencies including a lack of guidelines, a failure to disburse funds based on actual losses, and hiring inspectors who possessed conflicts of interests. *See* Press Release, Senator Joe Lieberman, Senator Collins and Lieberman Release Findings and Recommendations to Improve Safeguards in FEMA's Disaster Relief Program (July 10, 2005), attached to Kestin Decl. at Tab 4, p.FOIA00204–FOIA00206.

Of course, a general public interest in FEMA's disaster response activities is not, standing alone, a sufficient basis on which to disclose the private and personal information of the disaster claimants' addresses. There must be a nexus between the information that is sought under FOIA and the ability of the public to gain an understanding about FEMA's disaster relief operations. *Ray*, 502 U.S. at 178, 112 S.Ct. 541 (the public interest must be adequately served by the requested disclosure to avoid an unwarranted invasion of privacy). The Court concludes that such a nexus exists and that the release of disaster

claimants' addresses is not "clearly unwarranted."

The addresses sought are of the properties that were awarded disaster assistance based on claims of damage from the various hurricanes. Thus, in order to examine properly the distribution of disaster assistance by FEMA, it is necessary to make available those addresses. The record shows that the Inspector General of the Department of Homeland Security Office unearthed evidence that FEMA disbursed funds in Miami–Dade County without verifying the claims of property damage and without adequate oversight of the inspections of the properties in question. *See* Office of Audits, Audit of FEMA's Individuals and Households Program in Miami–Dade County, Florida, for Hurricane Frances, OIG–05–20 (May 2005), attached to Kestin Decl. at Tab 2, pp. FOIA00075, FOIA00079, FOIA00083. Despite the significance of the Inspector General's findings, that investigation only examined three percent of the nearly $31 million awarded to Miami–Dade County residents. *See* Office of Audits, Audit of FEMA's Individuals and Households Program in Miami–Dade County, Florida, for Hurricane Frances, OIG–05–20 (May 2005), attached to Kestin Decl. at Tab 2, pp. FOIA00078. The release of these addresses will shed light on the activities and operations of FEMA; namely, the extent to which ineffective quality controls and processing of aid applications may have resulted in wasteful spending of taxpayer dollars by FEMA.[7] Merely knowing the number of claimants and the amount of relief awarded to claimants within a geographic area as large as a zip code does not provide sufficient data for an interested citizen to evaluate the manner in which FEMA carried out its statutory responsibilities.[8] Without the addresses of the purported damaged property, it would not be possible to analyze fully the allegations of fraud and wasteful spending. Likewise, the disclosure of the addresses would allow the public to examine and debate the policies of FEMA relative to the processing and payment of claims. Armed with such information, an informed citizen could seek to lobby for either legislative or administrative changes that might improve the performance of FEMA's delegated duties. Thus, the release of the addresses of disaster claimants is not "clearly unwarranted" and would serve to inform the citizenry as to what the "government is up to." *Federal Labor Relations Auth.*, 510 U.S. at 497, 114 S.Ct. 1006 *quoting Reporters Comm.*, 489 U.S. at 773, 109 S.Ct. 1468 (internal quotation marks omitted).

 Turning to the release of names of disaster claimants, the Court finds that the privacy interest in names equals the privacy interest in home addresses. *See Sheet Metal Workers Int'l Ass'n v. U.S. Air Force*, 63 F.3d 994, 997 (10th Cir.1995) ( there is a "substantial privacy interest in personal identifying information, such as names and addresses" and there is no

---

7. Although FEMA claims that these investigations revealed sufficient and substantial information to the public, the addresses will provide critical information that is currently lacking from the public debate. *Cf. Horowitz v. Peace Corps*, 428 F.3d 271, 278 (D.C.Cir. 2005) ("[t]he availability of other sources lessens the public interest in its release through FOIA").

8. FEMA argues that it produced voluminous information to the Sun–Sentinel and therefore the Sun–Sentinel "knows where the disaster monies went in Florida in 2004." *See* Plaintiff's Response to Defendant's Motion for Summary Judgment. Although FEMA did supply information to the Sun–Sentinel that included the zip codes where the alleged damage to property occurred, a zip code encompasses a large area and a hurricane can damage some homes and leave other homes in the same zip code untouched.

distinction between cases that involve the disclosure of names or cases that involve the disclosure of names and addresses). Indeed, many cases considering the issue of the release of names include an analysis of both names and addresses. *See e.g., Sheet Metal Workers Int'l Ass'n v. United States Dep't of Veterans Affairs*, 135 F.3d 891 (3d Cir.1998); *United States Dep't of Navy v. Federal Labor Relations Auth.*, 975 F.2d 348 (7th Cir.1992); *Hopkins v. United States Dep't of Housing*, 929 F.2d 81 (2d Cir.1991); *National Assoc. of Retired Fed. Employees v. Horner*, 879 F.2d 873 (D.C.Cir.1989). Furthermore, as with addresses, the release of the names of disaster claimants would be coupled with the same personal information previously discussed. *Cf. Fund for Constitutional Gov't v. National Archives and Records Serv.*, 485 F.Supp. 1, 5 (D.D.C.1978) (an individual name appearing in a personnel or medical file "without more will probably not engender comment and speculation"). Thus, the Court finds that the release of the names of disaster claimants constitutes a significant privacy interest.

The next step in this analysis requires an examination as to whether this invasion of privacy would be "clearly unwarranted." Once again, the Court must look to whether releasing of the names of disaster claimants would contribute to a greater public understanding of the operations of FEMA.

*Federal Labor Relations Auth.*, 510 U.S. at 497, 114 S.Ct. 1006. After careful consideration, the Court concludes that the release of names would be "clearly unwarranted" and would not serve the purpose of informing the citizenry "what their government is up to."

Whereas the addresses goes to the heart of whether FEMA improperly disbursed funds to property that sustained no damage, the names of disaster claimants are not as probative. In cases where the name and addresses accurately reflect the property where the disaster claimant resides, the name of the disaster claimant would provide no further insight into the operations of FEMA. Once the addresses are released, the inquiry would concern whether the property sustained the damage claimed and the name of the disaster claimant would not shed additional light on this inquiry. In cases where a claimant provided an address that sustained property damage but that was not owned by that claimant, the name would not, in and of itself, show that fraud was perpetrated upon FEMA. Instead, the Sun–Sentinel would only reach that conclusion by researching who owns the property. *See Sheet Metal*, 63 F.3d at 998 (release of names in FOIA case would require derivative use [9] of that information and thus was too attenuated to trump the privacy interest involved).[10] Thus, the possibility of

9. Although the United States Supreme Court has declined to address whether "derivative use" could justify releasing information pursuant to FOIA, the Supreme Court has stated that "[m]ere speculation about hypothetical public benefits cannot outweigh a demonstrably significant invasion of privacy." *Ray*, 502 U.S. at 179, 112 S.Ct. 541.

10. In *National Ass'n of Home Builders v. Norton*, the court released addresses of property owners where there had been pygmy owl sightings. Although the party seeking this information only sought addresses and not names, the *Norton* Court stated that since the property owners' names could be found in

state records, it was irrelevant to the analysis that names were not sought. *Norton*, 309 F.3d 26, 36–37 (D.C.Cir.2002). Although the Court recognizes that providing the addresses of disaster claimants may lead to the discovery of the disaster claimants' names, the Court finds that precluding the release of addresses in this case would deprive the public of information critical to the operations of FEMA. Moreover, the names, in and of themselves, do not inform the public about the operations of FEMA; it is only through the derivative use of the addresses that the names will be uncovered. Finally, withholding the addresses based on the fear that names will be discovered would result in withholding any

finding fraud through the release of the names is speculative. As such, the Court finds that the release of names would not serve the public interest of demonstrating the operations and activities of FEMA. *See Stabasefski v. United States,* 919 F.Supp. 1570 (M.D.Ga.1996) (finding that the release of names of recipients who received subsistence payments "would not shed any additional light on the operation of FEMA" given that other disclosed information included copies of the subsistence claims); *see also Ray,* 502 U.S. at 174 n. 10, 112 S.Ct. 541 *quoting* S.Rep. No. 813, 89th Cong., 1st Sess., 7 (1965) (in discussing the balance between a citizen's privacy right and the public right to know, Congress noted that while "it may be pertinent to know that unseasonably harsh weather has caused an increase in public relief costs [ ] it is not necessary that the identity of any person so affected be made public").

To be sure, both parties in this case argue for a different outcome than the decision reached herein. For example, FEMA asserts that the privacy interest outweighs the public interest and that the release of the addresses would not serve the public interest. In contrast, the Sun–Sentinel claims that the names and addresses of disaster claimants are not inherently private and that the release of both the names and addresses would serve the public interest. In making these arguments, both parties cite numerous FOIA

cases to support their respective positions. The Court will next examine and distinguish these cases.

The Sun–Sentinel points to numerous cases that found that the names and addresses were not sufficiently personal to rise to the level of an invasion of privacy. *See e.g., Washington Post Co. v. United States Dep't of Agric.,* 943 F.Supp. 31 (D.D.C.1996); *Southern Utah Wilderness Alliance, Inc., v. Hodel,* 680 F.Supp. 37 (D.D.C.1988); *Kurzon v. Department of Health and Human Servs.,* 649 F.2d 65 (1st Cir.1981). However, two of these cases concern the release of an individual's business address as opposed to a home address. *See Kurzon, 649 F.2d at 69; Washington Post,* 943 F.Supp. at 35. Clearly, the privacy interest in a business address is not as significant as the privacy interest in a home address. With respect to *Southern Utah,* the names and addresses were not able to be linked to the type of personal information that is at issue here. The only information that could be linked to the names and addresses in *Southern Utah* was the use of a public park. *Southern Utah,* 680 F.Supp. at 38.

FEMA points to cases that found that the release of names and addresses under FOIA would lead to a clearly unwarranted invasion of privacy. *See, e.g., Sheet Metal Workers,* 63 F.3d at 998; *Horner,* 879 F.2d at 876. Each of these cases, however, concluded that the public interest in learning the operations of the government would not be met by the release of this information.[11] Specifically, in *Horner,* the

---

information that could eventually lead to the discovery of names.

**11.** In *Sheet Metal,* the Tenth Circuit addressed whether a FOIA request by a union should be denied on the basis of Exemption 6. The union sought the payroll records and apprentice registration forms with the names of employees who work for companies performing government contracts. The union argued that the release of this information would reveal whether the Air Force was properly monitoring compliance by private contractors. *Sheet*

*Metal,* 63 F.3d at 998. The Tenth Circuit ruled that the public interest in disclosure of these records, with the names attached, was "too attenuated to outweigh the identified and substantial privacy interest involved." *See id.* (internal quotation marks omitted). This decision fully supports this Court's finding that release of the names of the disaster claimants would be "too attenuated" whereas the release of the addresses would serve to assist the public in learning about the operations of the government.

National Association of Retired Federal Employees sought access to a list of potential eligible federal retirees' names and addresses in order that it could recruit new members to its organization. *Horner,* 879 F.2d at 874. The *Horner* Court held that the disclosure of this information would serve only to aid in the Association's lobbying efforts and not inform the general public as to what their government is up to. *Id.* at 878–79. In making this ruling, the *Horner* Court noted that the United States Supreme Court in *Reporters Committee* differentiated between a FOIA disclosure that demonstrated the operations of the government versus the "disclosure of information about private citizens that is accumulated in various governmental files but that reveals little or nothing about an agency's own conduct." *Id.* at 879 *quoting Reporters Committee,* 489 U.S at 773, 109 S.Ct. 1468.[12]

Accordingly, the Court concludes that FEMA properly invoked Exemption 6 to protect the names of the disaster claimants; however, Exemption 6 does not apply to the release of the addresses of the disaster claimants.

### B. Release of Names and Identification Numbers of FEMA Inspectors

FEMA argues that it is prohibited from releasing the names and identification of FEMA Inspectors under Exemptions 4 and 6 of FOIA. With respect to Exemption 6, FEMA claims that the release of the inspectors' names and identification numbers would violate the privacy of the in-spectors. *See* Defendant's Motion for Summary Judgment at 33. With respect to Exemption 4, FEMA claims that the names and identification numbers of FEMA inspectors are "commercial information" that may "cause substantial harm to the competitive position of the person from whom the information was obtained." *See* Defendant's Motion for Summary Judgment at 32.

█ The Court begins its analysis by turning to FEMA's argument that releasing the names and identification numbers of the FEMA inspectors would constitute a clearly unwarranted invasion of privacy. As previously discussed, the Court must balance "the public interest in disclosure against the [privacy] interest Congress intended the [e]xemption to protect." *See Federal Labor Relations Auth.,* 510 U.S. at 495, 114 S.Ct. 1006 *quoting Reporters Comm.,* 489 U.S. at 776, 109 S.Ct. 1468. Typically, employment history, in and of itself, "is not normally regarded as highly personal." *United States Dep't of State v. Washington Post Co.,* 456 U.S. 595, 600, 102 S.Ct. 1957, 72 L.Ed.2d 358 (1982); *see also Washington Post Co. v. United States Dep't of Health and Human Svcs.,* 690 F.2d 252, 261 (D.C.Cir.1982) (no substantial privacy issue in consultants' employment information). With respect to the public interest, the record demonstrates that there is a strong public interest in the disclosure of the identities of the FEMA inspectors. Indeed, the Sun–Sentinel points to record evidence that the Inspec-

---

**12.** The Court does not discount FEMA's argument that there is a potential for negative secondary effects upon release of the addresses of the disaster recipients. *See* Defendant's Motion for Summary Judgment at 23–25. However, the Court believes that the release of these addresses, despite the substantial privacy interest, is uniquely important under the facts of this case. *See Columbia Packing Co., Inc. v. United States Dep't of Agric.,* 563 F.2d 495 (1st Cir.1977) (FOIA disclosure of personnel information of former federal meat inspectors who were convicted of receiving bribes was proper given the strong public interest). Furthermore, by not releasing the names of the disaster claimants, the Court believes that the potential for the various legitimate secondary effects raised by FEMA will be substantially reduced.

tor General found that FEMA's inspectors were poorly trained and lacked oversight. Kestin Decl. at ¶ 14, Tab 2, p. FOIA00101–02. Additionally, the Homeland Security and Government Affairs Committee discovered that inspectors filled out forms without examining the purported damaged property and that a significant number of inspectors had criminal records. Notice of Filing Transcript at Ex. A, p.FOIA00374 and FOIA00438. Clearly, the release of the names and identification numbers of the FEMA inspectors will allow the public to examine fully whether the process of selecting FEMA inspectors should be improved and whether these inspectors violated the public's trust in awarding disaster assistance. In other words, the information would serve to inform citizens "what their government is up to." Notably, FEMA does not point the Court to any caselaw supporting its position that releasing the names and identification numbers of FEMA inspectors would constitute a "clearly unwarranted" invasion of privacy. This Court is hard pressed to understand how revealing that an individual works for a government contractor would constitute an invasion of privacy. Thus, on the basis of this record, the Court concludes that Exemption 6 does not bar the release of the inspector's names and identification numbers.

▄▄▄▄▄ FEMA argues that Exemption 4 applies to the release of the inspector names and identification numbers because this information is commercial and confidential. Exemption 4 protects "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential." 5 U.S.C. § 552(b)(4). In order for Exemption 4 to apply, FEMA must show that the inspector names and identification numbers are commercial, obtained from a

person and confidential.[13] *See National Parks and Conservation Ass'n v. Morton,* 498 F.2d 765 (D.C.Cir.1974); *see also Nadler v. F.D.I.C.,* 92 F.3d 93 (2d Cir. 1996). Further, in order to demonstrate that the commercial information is confidential for purposes of Exemption 4, FEMA must demonstrate that disclosure of this information is likely to (1)"impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained." *National Parks,* 498 F.2d at 770.

FEMA argues that the names and identification numbers of the inspectors is confidential "because the contractors have a commercial interest in key employees and personnel" and that a loss of personnel would "impair the contractors' commercial interests." *See* Defendant's Motion for Summary Judgment at 32. Additionally, FEMA states that by releasing these names, potential competitors could "contact the inspectors to gain information as to the inner workings of the organization, attempt to recruit key personnel, or otherwise interfere with essential employees." *See id.* at 33. In support of these contentions, FEMA provides citations to the record. However, these citations do not address the import of the names and identification numbers of the inspectors, but the names of key personnel from PaRR and Alltech. *See* Defendant's Motion for Summary Judgment at 32–33 *citing* Hugh Inglis Declaration at ¶ 11 and Lawrence Olinger Declaration at ¶¶ 10–11. Significantly, FEMA has agreed to release to the Sun–Sentinel the names of key personnel from PaRR and Alltech. *See* DE 57, Defendants' Notice of Release of Records.

---

**13.** FEMA does not assert that this information is a trade secret.

 Notably, in FEMA's Response to the Sun–Sentinel's Motion for Summary Judgment and in FEMA's reply to Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment, it raises, for the first time, an argument that the appropriate test for the release of the inspector names and identification numbers is set forth in *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871 (D.C.Cir.1992) and not *National Parks*.[14] *See* Defendant's Response to Summary Judgment at 13; Defendant's Reply at 9. Although both parties agree that *Critical Mass* applies to information under Exemption 4 when information is submitted voluntarily to the government, the parties disagree as to whether this information was voluntarily turned over to FEMA. After careful review of the record, it is clear that this information was not voluntarily turned over to the government, but that FEMA's contracts with PaRR and Alltech required those companies to provide a list of the inspector's names.[15] *See* DE 23 at Ex. E p.134 ¶ C.8.3 (Alltech); p. 138 ¶ C.8.3 (PaRR). Thus, the Court concludes that *Critical Mass* is not the applicable legal standard given the record. Lastly, based on the lack of record support, as well as FEMA's abandonment of the argument that *National Parks* applies, the Court finds that FEMA has failed to demonstrate that the names and identification numbers of the inspectors fall under Exemption 4 of FOIA. As such, Exemptions 4 and 6 do not apply to the disclosure of the names and identification numbers of the FEMA inspectors.[16]

## C. Inspector Comment Fields

 FEMA contends that it cannot release the inspector comment fields from Request No. 05–073 because it would significantly interfere with FEMA's automated information systems. FEMA provides an affidavit from Berl Jones, Deputy Branch Chief of the Individual Assistance Branch of FEMA. *See* Exhibit M. Affidavit of Berl Jones, attached to Defendant's Motion for Summary Judgment. According to Mr. Jones, it is not possible to extract the inspector comments without "severely disrupt[ing]" and shutting down FEMA's entire NEMIS system. *Id.* at ¶ 15. The NEMIS system is the "primary database" used by FEMA to handle its disaster relief efforts. *Id.* at ¶ 16. According to FEMA, technical problems prevent FEMA's staff from "access[ing] and produc[ing] the information without significantly interfering with the operation of FEMA's disaster operating system . . . ." *See* Defendant's Motion for Summary Judgment at 38.

14. At oral argument, FEMA argued that *National Parks* was not the correct standard to apply in this case.

15. At oral argument, counsel for FEMA stated that, despite the wording of the contracts, FEMA does not maintain lists of the names of inspectors provided by their contractors and directed the Court to an affidavit from FEMA personnel supporting this contention. *See* Exhibit C, attached to Defendant's Motion for Summary Judgment, Affidavit of Robert S. Brock at ¶ 8. Of course, a policy of not maintaining records of the names of the individual inspectors does not mean that the contractors were not required to provide these names under their contract with FEMA. Thus, the *National Parks* test is proper given the wording of the contracts. That stated, FEMA obviously cannot turn over a list containing names of the inspectors if such a list never existed. But, to the extent the names of the inspectors are found in the NEMIS database, or on any other FEMA document that was requested by the Sun–Sentinel, Exemption 4 does not protect that information.

16. At oral argument, FEMA agreed to turn over the "check sheets," the interim reports and the final reports that relate to quality control results. These documents are voluminous and will require time-consuming redaction based upon the Court's ruling that the names of disaster claimants can be withheld.

According to Mr. Jones, the inspector comments field in the NEMIS database is one of many fields in the NEMIS database. *See* Exhibit M, Affidavit of Berl Jones, attached to Defendant's Motion for Summary Judgment, at ¶ 14. The comments field "allows FEMA to input miscellaneous information specific to the disaster victim such as follow-up contacts, problems ..." *Id.* Inspectors use this field to place several lines or pages of comments in the individual disaster claimant's file. *Id.* According to Mr. Jones, it is "impossible" to extract the inspector comments and the entire NEMIS system would need to be shut down to download the entire comments field. *Id.* at ¶ 15.

FEMA asserts that FOIA protects government agencies from providing information that would interfere with their automated information system. In support, FEMA points to a provision in FOIA that states: "[i]n responding under this paragraph to a request for records, an agency shall make reasonable efforts to search for the records in electronic form or format except when such efforts would significantly interfere with the operation of the agency's automated information systems." *See* 5 U.S.C. § 552(a)(3)(C).[17]

In response, the Sun–Sentinel asserts that 5 U.S.C. § 552(a)(3)(C) only applies to an agency's obligation in searching its records and does not apply to its obligations in producing records that it knows exist. *See* Plaintiff's Response at 9 n. 5. Thus, according to the Sun–Sentinel, if the records have already been located by FEMA, this provision does not apply. Furthermore, the Sun–Sentinel points to record evidence that demonstrates that a portion of the inspector comments field may have been provided to the Inspector General. *See* Plaintiff's Response to Motion for

Summary Judgment at 10; Office of Audits, Audit of FEMA's Individuals and Households Program in Miami–Dade County, Florida, for Hurricane Frances, OIG–05–20 (May 2005), attached to Kestin Decl. at Tab 2, pp. FOIA00086. Additionally, the Sun–Sentinel argues that, based on FEMA's ability to produce other fields in the database, it is inconsistent for FEMA to claim that this one particular database cannot be extracted. *See* Plaintiff's Response at 9.

With respect to FEMA's invocation of 5 U.S.C. § 552(a)(3)(C), the Court finds that the record is unclear as to whether this provision applies. Specifically, it is uncertain that the problem with FEMA's automated system concerns the inability of FEMA to search for these records or to produce these records. This is significant because the statute relied upon by FEMA only addresses problems with searching for records as opposed to producing records. Furthermore, the disputed factual issues raised by the Sun–Sentinel make summary judgment inappropriate on this point. Instead, the Court must hold an evidentiary hearing to resolve these factual issues.

### D. E-mail Correspondence

FEMA asserts that the withheld and redacted e-mails fall under Exemption 5 of FOIA. Exemption 5 protects government documents that are "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). FEMA argues that the withheld and the redacted e-mails fall under the "deliberative process privilege" and "attorney client privilege" of Exemption 5. *See* Defendant's Motion for

---

**17.** "[T]he term search means to review, manually or by automated means, agency records for the purpose of locating those records which are responsive to a request." 5 U.S.C.(a)(3)(D).

Summary Judgment at 29, 31. In response, the Sun–Sentinel claims that FEMA's *Vaughn* Index suffered from numerous deficiencies that relate to these e-mails. Specifically, Sun–Sentinel argues that the *Vaughn* index improperly limited the Sun–Sentinel's request to exclude e-mail communications that were not addressed to Brown [18] and invoked the deliberative process privilege in a conclusory manner. *See* Plaintiff's Memorandum in support of Summary Judgment at 29–31.

■ Turning first to the deliberative process privilege, the Court recognizes that this privilege allows government agencies to "freely explore possibilities, engage in internal debates, or play devil's advocate without the fear of public scrutiny." *Moye*, 376 F.3d at 1277. Additionally, this privilege protects against premature disclosure of policies before they are adopted as well as public confusion that might result from the disclosure of documents that were not the true reason for the agency's actions. *Id.* To invoke the deliberative process privilege, the document must be predecisional and deliberative. *Id.* "A document is deliberative if the disclosure of the materials would expose an agency's decision-making process in such a way as to discourage candid discussion within the agency and, thereby, undermine the agency's ability to perform its functions." *Id.* at 1278. "A predecisional document is one prepared to assist an agency decision-maker in arriving at his decision and may include recommendations, draft documents, proposals, suggestions, and other subjective documents

which reflect the personal opinions of the writer rather than the policy of the agency." *Id.* at 1277–78.

■ Exemption 5 also extends to information that qualifies as confidential communications between an attorney and his client that relates to a legal matter for which the client has sought professional advice. *See Mead Data Central, Inc. v. United States Dep't of Air Force*, 566 F.2d 242, 252 (D.C.Cir.1977).

■ The Court has conducted an *in camera* review of the e-mails that were redacted and/or withheld by FEMA. With respect to the invocation by FEMA of attorney-client privilege, the Court finds that these two e-mails were properly withheld in their entirety because the information contained in the e-mails falls within the scope of attorney-client privilege. These e-mails contain confidential legal advice from the General Counsel of FEMA to FEMA officials. As such, Exemption 5 applies to these e-mails.

■ FEMA asserts that the remaining e-mails that were either redacted and/or withheld qualify under Exemption 5 as deliberative process privilege. In making that argument, FEMA contends that these e-mails contained recommendations or advice from a subordinate to a superior official. After a careful *in camera* review, the Court concludes that these remaining e-mails do not contain information that is exempt from disclosure under FOIA. Although the e-mails contain advice and opinions for Brown to consider, these e-

18. The Sun–Sentinel claims that FEMA limited its FOIA request to e-mails that were "addressed" to or from Brown and not e-mails that were simply "to or from" Brown. According to the Sun–Sentinel, e-mails that were "to or from" Brown would have included e-mails addressed to Brown, sent to or from him, copied to him or forwarded to or from him. *See* Plaintiff's Memorandum in

Support of Summary Judgment at 28. In response, FEMA argues that it identified all the e-mails with the requested words that were eventually forwarded or sent to Brown. *See* Defendant's Response at 9. This disputed factual issue cannot be resolved at the summary judgment stage. Thus, the Court will conduct an evidentiary hearing on this matter.

mails do not contain advice that relate the mission of FEMA, *i.e.,* disaster recovery and assistance. Instead, the e-mails offer suggestions and comments regarding suitable responses to inquiries from the press that questioned the appropriateness of FEMA's decisions in the wake of the hurricane disasters. In other words, these e-mails have no relationship to a policy matter or a decision regarding the formulation of FEMA policy. Since these e-mails served to assist FEMA officials in answering questions and defending FEMA's disaster response, the Court finds that withholding these e-mails would be contrary to the primary objective of FOIA; namely, "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Rose,* 425 U.S. at 361, 96 S.Ct. 1592. Accordingly, the e-mails that were withheld or redacted pursuant to the deliberative process privilege do not fall within the scope of Exemption 5.

### *IV. Conclusion*

It is hereby **ORDERED AND AD-JUDGED** as follows:

1) The Sun–Sentinel's Motion for Summary Judgment [DE 31] is **GRANTED IN PART AND DENIED IN PART** consistent with the rulings set forth herein.

2) FEMA's Motion for Summary Judgment [DE 39] is **GRANTED IN PART AND DENIED IN PART** consistent with the rulings set forth herein.

3) A forthcoming order shall set forth a date for an evidentiary hearing that will address the release of the inspector comments field and any remaining issues regarding the e-mail communications.